## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| SANY AMERICA INC. and SANY LOGISTICS EQUIPMENT AMERICA INC. | : : : : |
| Plaintiffs, | : : |
| v. | : : Court No.  25-00527 : |
| U.S. CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF U.S. CUSTOMS AND BORDER PROTECTION, and THE UNITED STATES OF AMERICA, | : : : : : : : : |
| Defendants. | : : : |

## **COMPLAINT**

Plaintiffs, SANY America Inc. and SANY Logistics Equipment America Inc. (hereinafter "Plaintiffs"), by and through their attorneys, allege and state as follows:

1.      This action challenges Defendants' broad and sweeping imposition of tariffs on imports from numerous countries under the International Emergency Economic Powers Act ("IEEPA").  Neither the Constitution nor IEEPA grants the President such broad tariff-levying authority.  Beginning in February of this year, through a series of executive orders, President Trump invoked IEEPA as authority to impose new and substantial tariffs ("IEEPA duties") on goods imported from nearly every foreign country, including countries from which Plaintiffs source their imports.  Plaintiffs are responsible for paying these tariffs on their imported goods.

2.      IEEPA does not authorize these tariffs.  This Court and the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") have already so held.  *See V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025), *cert. granted*, No. 25-250, 2025 LX 313715 (U.S. Sept.

9, 2025); *see also V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025).

3.    Through this action, Plaintiffs ask the Court to hold precisely what this Court and the Federal Circuit already held in *V.O.S. Selections*:  that the IEEPA duties imposed by Defendants, and the underlying executive orders that directed them, are unlawful.

4.    The Supreme Court heard oral argument in *V.O.S. Selections* and a companion case arising out of the U.S. District Court for the District of Columbia on November 5, 2025, and is expected to rule on the merits of those claims in the near future.  *See V.O.S. Selections*, 149 F.4th at 1340; *see also Learning Res., Inc. v. Trump*, 784 F. Supp. 3d 209 (D.D.C. 2025), *cert. granted before judgment*, No. 24-1287, 2025 LX 308086 (U.S. Sept. 9, 2025).

5.    This separate action is necessary, however, because even if the IEEPA duties and underlying executive orders are held unlawful by the Supreme Court, importers that have paid IEEPA duties, including Plaintiffs, are not guaranteed a refund for those unlawfully collected tariffs in the absence of their own judgment and judicial relief.

6.    This action is necessary now because Plaintiffs paid tariffs that were imposed under IEEPA, and U.S. Customs and Border Protection ("CBP") is expected to begin liquidating entries that are subject to IEEPA tariffs by December 15, 2025, if not sooner.  Plaintiffs seek relief from the impending final liquidations to ensure that its right to a complete refund is not jeopardized.  To that end, Plaintiffs intend to file a motion for a preliminary injunction to suspend liquidation *pendente lite*.

7.    Accordingly, Plaintiffs seek in this action (i) a declaration that the IEEPA duties are unlawful; (ii) an injunction preventing Defendants from imposing further duties on Plaintiffs under the executive orders challenged in this lawsuit; (iii) a full refund from Defendants of all

IEEPA duties Plaintiffs already paid to the United States as a result of the executive orders challenged in this lawsuit, and those IEEPA duties that Plaintiffs will continue to pay; and (iv) payment to Plaintiffs of interest on the IEEPA duties that Defendants have collected, and continue to collect, from Plaintiffs.

## JURISDICTION

8.    The Court possesses subject-matter jurisdiction over this action under 28 U.S.C. § 1581(i) and 28 U.S.C. § 2631(i), and under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 704, 706.

9.    28 U.S.C. § 1581 provides that "the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . . tariffs, duties, fees, or other taxes on the importation of merchandize for reasons other than the raising of revenue," 28 U.S.C. § 1581(i)(1)(B), and "administration and enforcement with respect to the matters referred to in paragraphs (A) through (C) of this paragraph and subsections (a)–(h) of this section." *Id*. § 1581(i)(1)(D).

10.    Here, the claims at issue relate to executive orders that amending the Harmonized Tariff Schedule of the United States ("HTSUS").  The HTSUS is a law of the United States setting tariffs, and this Court thus possesses subject-matter jurisdiction over this action under 28 U.S.C. § 1581(i).  *See V.O.S. Selections*, 149 F.4th at 1329.

11.    The APA provides that "{a}gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."  5 U.S.C. § 704.  Further, the APA provides for broad judicial review of agency actions brought by "person{s} suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of the relevant statute."  5 U.S.C. § 702.

12.     The Court has the same powers at law, in equity, and as conferred by statute as a United States District Court.  28 U.S.C. § 1585.  In a civil action under 28 U.S.C. § 1581, the Court can enter a money judgment against the United States and can order any other appropriate civil relief, including declaratory judgments, injunctions, orders of remand, and writs of mandamus or prohibition.  28 U.S.C. §§ 2643(a)(1), (c)(1).

13.     Plaintiffs have standing to bring this lawsuit because they were importers of record for goods imported into the United States from countries subject to the unlawful IEEPA duties as implemented and collected by CBP.  As a result of the executive orders challenged by this lawsuit, Plaintiffs have paid IEEPA duties to the United States and thus have suffered injury caused by those orders.  The injury is ongoing as Plaintiffs continue to pay IEEPA duties. Declaratory and injunctive relief from this Court would redress those injuries.  Plaintiffs also face imminent and irreparable harm because entries for which it has paid IEEPA duties are expected to liquidate as early as December 15, 2025, if not sooner.

## PARTIES

14.     Plaintiffs are importers that have made numerous entries of merchandise that were subject to IEEPA duties and have either deposited or paid the additional duties.

15.     Defendant CBP is a component agency of the Department of Homeland Security ("DHS") headquartered in Washington, D.C.  CBP is responsible for border security and collecting tariffs or duties and taxes on goods imported into the United States.

16.     Defendant Rodney S. Scott is the Commissioner of CBP and is sued in his official capacity.

17.     Defendant United States of America received the disputed tariffs and is the statutory defendant under 5 U.S.C. § 702 and 28 U.S.C. § 1581(i)(1)(B).  Defendants are referred

to collectively in this complaint as "CBP."

## GENERAL PLEADINGS

I.     **President Trump Ordered a Series of Tariffs, Invoking IEEPA as the Basis for this Authority**

A.  **The IEEPA Duties**

18.     On February 1, 2025, U.S. President Donald J. Trump issued three executive orders imposing tariffs on imports from Canada, Mexico, and China.  Each executive order was premised on IEEPA authorizing the tariffs, and President Trump claimed each set of tariffs was justified under IEEPA because of a purported national emergency.

19.     The executive order directed at Mexico, Executive Order 14,194, *Imposing Duties To Address the Situation at Our Southern Border*, 90 Fed. Reg. 9,117 (Feb. 7, 2025) ("Mexico Tariff Order"), imposed an additional 25 percent tariff on the import of goods from Mexico.  The President's claim of emergency powers was based on "the grave threat to the United States posed by the influx of illegal aliens and illicit drugs into the United States" and "the failure of Mexico to arrest, seize, detain, or otherwise intercept {drug trafficking organizations}, other drug and human traffickers, criminals at large, and illicit drugs."  *Id*. at 9,118.

20.     The executive order directed at Canada, Executive Order 14,193, *Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 9,113 (Feb. 7, 2025) ("Canada Tariff Order"), declared an emergency because of opioid trafficking, and also imposed a 25% tariff, with certain exceptions.

21.     The executive order directed at China, Executive Order 14,195, also declared an emergency because of opioid trafficking, declaring that "the sustained influx of synthetic opioids" was a national emergency and that "{m}any PRC-based chemical companies also go to great lengths to evade law enforcement and hide illicit substances in the flow of legitimate

commerce." Exec. Order No. 14,195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,121 (Feb. 7, 2025) ("China Tariff Order"). The President's claim of emergency powers was based on "the grave threat to the United States posed by the influx of illegal aliens and drugs into the United States" and "the failure of the {People's Republic of China} government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other {transnational criminal organizations}, criminals at large, and drugs." *Id*. at 9,122 (internal citations omitted).

22.    The China Tariff Order imposed an additional 10% *ad valorem* tariff on products from China imported into the United States on top of existing duties.

23.    Four days later, on February 5, 2025, the President issued another order, Executive Order 14,200, *Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,277 (Feb. 11, 2025) ("February 5 Amendment").

24.    The next month, on March 3, 2025, the President amended the China Tariff Order again through Executive Order 14,228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,463 (Mar. 7, 2025). The March 3 Amendment raised the incremental tariffs on imports from China to 20% and justified this increase by claiming that "the PRC has not taken adequate steps to alleviate the illicit drug crisis." *Id*. at 11,463.

25.    On April 2, 2025, citing trade deficits with our trading partners as a separate national emergency, President Trump issued Executive Order 14,257, *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 7, 2025) ("Reciprocal Tariff Order"). The Reciprocal Tariff Order imposed a 10% baseline tariff on nearly all imports to the

United States, effective April 5, and additional "reciprocal" tariffs on 57 countries, effective April 9. *Id*. at 15,049–50 (Annex I). These higher country-specific tariffs range from 11% to 50%. *Id*.

26.    The Reciprocal Tariff Order asserts that "U.S. trading partners' economic policies … suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits." Reciprocal Tariff Order, 90 Fed. Reg. at 15,041.

27.    On April 8, 2025, the President responded to retaliatory tariffs from China by raising the reciprocal tariff rate on China by 50 percentage points—from 34% to 84%. Exec. Order No. 14,259, *Amendment to Reciprocal Tariffs and Updated Duties As Applied to Low-Value Imports from the People's Republic of China*, 90 Fed. Reg. 15,509 (Apr. 14, 2025).

28.    The next day, the President suspended for 90 days the higher country-specific tariffs on all countries except for China, for which he raised the "reciprocal" tariff again—from 84% to 125%. Exec. Order No. 14,266, *Modifying Reciprocal Tariff Rates To Reflect Trading Partner Retaliation and Alignment*, 90 Fed. Reg. 15,625 (Apr. 15, 2025). Meanwhile, the 20% trafficking tariff on imports from China remained in place, such that most imports from China faced a minimum 145% IEEPA tariff.

29.    In implementing the executive order-based tariff regime, the Defendant directed CBP to effectuate changes to the HTSUS, requiring that goods subject to the challenged tariffs to be entered under new Chapter 99 tariff codes.

30.    On April 14, 2025, several companies filed an action in this Court challenging the legality of these tariff orders. *See V.O.S. Selections, et al. v. Donald J. Trump, et al.*, No. 25-00066, ECF. No. 2 (Apr. 14, 2025). As discussed below, this Court held the tariff orders were unlawful and the Federal Circuit, sitting *en banc*, affirmed.

31.     In the months since the *V.O.S. Selections* complaint was filed, President Trump, invoking IEEPA, has issued additional executive orders imposing additional tariffs and modifying others.  On July 30, 2025, the President invoked IEEPA to impose additional tariffs on imports from Brazil. Exec. Order No. 14,323, *Addressing Threats to the United States by the Government of Brazil,* 90 Fed. Reg. 37,739 (Aug. 5, 2025) ("Brazil IEEPA Order").  Also, on August 6, 2025, the President invoked IEEPA to impose additional tariffs on imports from India because the "Government of India is currently directly or indirectly importing Russian Federation Oil."  Exec. Order No. 14,329, *Addressing Threats to the United States by the Government of the Russian Federation*, 90 Fed. Reg. 38,701 (Aug. 11, 2025) ("Russian Federation IEEPA Order").  All the executive orders described above have been, and continue to be, modified by the President.[1]  As explained below, IEEPA does not authorize the President to

---

[1] *See, e.g.*, Exec. Order No. 14,197, *Progress on the Situation at Our Northern Border*, 90 Fed. Reg. 9,183 (Feb. 10, 2025); Exec. Order No. 14,198, *Progress on the Situation at Our Southern Border*, 90 Fed. Reg. 9,185 (Feb. 10, 2025); Exec. Order No. 14,226, *Amendment to Duties To Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 11,369 (Mar. 6, 2025); Exec. Order No. 14,227, *Amendment to Duties To Address the Situation at Our Southern Border*, 90 Fed. Reg. 11,371 (Mar. 6, 2025); Exec. Order No. 14,231, *Amendment to Duties To Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 11,785 (Mar. 11, 2025);  Exec. Order No. 14,232, *Amendment to Duties To Address the Flow of Illicit Drugs Across Our Southern Border*, 90 Fed. Reg. 11,787 (Mar. 11, 2025); Exec. Order No. 14,256, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China as Applied to Low-Value Imports*, 90 Fed. Reg. 14,899  (Apr. 7, 2025); Exec. Order No. 14,298, *Modifying Reciprocal Tariff Rates to Reflect Discussions With the People's Republic of China*, 90 Fed. Reg. 21,831 (May 21, 2025); Exec. Order No. 14,316, *Extending the Modification of the Reciprocal Tariff Rates*, 90 Fed. Reg. 30,823 (July 10, 2025); Exec. Order No. 14,325, *Amendment to Duties To Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 37,957 (Aug. 6, 2025); Exec. Order No. 14,326, *Further Modifying the Reciprocal Tariff Rates*, 90 Fed. Reg. 37,963 (Aug. 6, 2025); Exec. Order No. 14,334, *Further Modifying Reciprocal Tariff Rates To Reflect Ongoing Discussions With the People's Republic of China*, 90 Fed. Reg. 39,305 (Aug. 14, 2025); Exec. Order No. 14,346, *Modifying the Scope of Reciprocal Tariffs and Establishing Procedures for Implementing Trade and Security Agreements*, 90 Fed. Reg. 43,737 (Sept. 10, 2025); Exec. Order No. 14,357, *Modifying Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 50,725 (Nov. 7, 2025); Exec. Order No. 14,358, *Modifying Reciprocal Tariff Rates Consistent With the Economic and Trade Arrangement Between the United States and the People's Republic of China*, 90 Fed. Reg. 50,729 (Nov. 7, 2025); Exec. Order No. 14,360, *Modifying the Scope of the Reciprocal Tariffs With Respect to Certain Agricultural Products*, 90 Fed. Reg. 54,091 (Nov. 25, 2025); Exec. Order No. 14,361, *Modifying the Scope of Tariffs on the Government of Brazil*, 90 Fed. Reg. 54,467 (Nov. 26, 2025).

impose tariffs.  By this complaint, Plaintiffs challenge those orders the Federal Circuit already has held to be unlawful as well as the Brazil IEEPA Order and the Russian Federation IEEPA Order issued under the identical legal grounds ("Contested IEEPA Tariffs").

### B.  CBP's Implementation of the Unlawful Tariffs

32.    CBP is charged with the assessment and collection of duties, including the IEEPA duties.  *See* 19 U.S.C. §§ 1500, 1502.

33.    In 1988, Congress enacted the Omnibus Trade and Competitiveness Act of 1988, which adopted the new tariff nomenclature:  the HTSUS. Pub. L. No. 100–418, 102 Stat. 1107 (1988).  CBP classifies merchandise imported into the United States consistent with the HTSUS, which sets out the tariff rates and statistical categories using a series of nested chapters, headings, and subheadings.  19 U.S.C. § 1202.  The primary headings of the HTSUS describe broad categories of merchandise, while its subheadings provide a particularized division of the goods within each category.  *Id.*  CBP's regulations govern the classification and appraisement of merchandise, consistent with the HTSUS.  *See* 19 C.F.R. § 152.11 (2025) (stating "{m}erchandise shall be classified in accordance with the Harmonized Tariff Schedule of the United States (19 U.S.C. § 1202) as interpreted by administrative and judicial rulings").

34.    The United States International Trade Commission ("USITC") publishes and maintains the HTSUS consistent with presidential orders.  19 U.S.C. §§ 1202, 3005, 3006; *see also Michael Simon Design, Inc. v. United States,* 33 C.I.T. 1003, 1010, 637 F. Supp. 2d 1218, 1225 (2009) ("The authority to modify the HTSUS lies with the President"); *Maple Leaf Mktg., Inc. v. United States*, 528 F. Supp. 3d 1365, 1378–79 (Ct. Int'l Trade 2021).

35.    When goods enter the United States, CBP is responsible for assessing and collecting any tariffs on those goods, after confirming the HTSUS classification of the goods, according to the rates established by the HTSUS.  19 U.S.C. §§ 1202, 1500, 1502.  To facilitate

the collection of tariffs, CBP uses its Cargo Systems Messaging Service ("CSMS") to inform importers of changes to the amount and administration of import duties. The guidance incorporates and imposes the current duties imposed under the IEEPA Tariff Orders. CBP has effectuated the collection of unlawful IEEPA duties through its CSMS guidance,[2] which is a final agency action subject to review under the APA. Each guidance marks the consummation of its decision-making process because it announces the agency's implementation of the Contested IEEPA Tariffs.

### C. Liquidation

36.    19 C.F.R. § 159.1 states that "liquidation means the final computation or ascertainment of duties on entries for consumption or drawback entries."

37.    Typically, when goods enter the United States, the importer of record pays an estimated duty on the entry based on its customs declaration, which asserts a value, origin, and HTSUS classification for the imported goods. *See* 19 U.S.C. § 1484. CBP then reviews the customs declaration and may inspect the goods.

38.    CBP then "fix{es} the final appraisement of merchandise" by confirming the final value, classification, duty rate, and final amount of duty for the imported goods. *See* 19 U.S.C. § 1500.

39.    Once CBP determines the final amount of duty, CBP then "liquidates" the entry

---

[2] *See, e.g.*, U.S. Customs & Border Prot., CSMS # 64297449, Guidance: Additional Duties on Imports from Canada (Mar. 3, 2025), available at https://content.govdelivery.com/accounts/USDHSCBP/bulletins/3d519e9; U.S. Customs & Border Prot., CSMS # 64297292, Guidance: Additional Duties on Imports from Mexico (Mar. 3, 2025), available at https://content.govdelivery.com/accounts/USDHSCBP/bulletins/3d5194c; U.S. Customs & Border Prot., CSMS # 64299816, Update – Additional Duties on Imports from China and Hong Kong (Mar. 3, 2025), available at https://content.govdelivery.com/accounts/USDHSCBP/bulletins/3d52328; U.S. Customs & Border Prot., CSMS # 64680374, Guidance – Reciprocal Tariffs, April 5 and April 9, 2025, Effective Dates (Apr. 8, 2025), available at https://content.govdelivery.com/accounts/USDHSCBP/bulletins/3daf1b6.

and notifies the importer of record as to whether the importer owes more money or is entitled to a refund. *See* 19 U.S.C. § 1504.

40. Liquidation—unless extended—must occur within one year. *See id*. § 1504(a). Typically, liquidation occurs automatically by operation of law. As a matter of practice, CBP normally liquidates entries 314 days after the date of entry and provides notice to the importer.

41. CBP has discretion to extend the deadline for liquidation for up to one year pursuant to an importer's request and a showing of good cause. *See id*. § 1504(b)(2); *see also* 19 C.F.R. § 159.12(a)(1)(ii).

42. This Court possesses the equitable authority to suspend liquidation. *See In re Section 301 Cases*, 524 F. Supp. 3d 1355, 1372 (Ct. Int'l Trade 2021).

43. Once liquidation has occurred, and *if* the liquidation is protestable, an importer of record has 180 days to file a protest contesting the liquidation, asking CBP to "reliquidate" the duties. *See* 19 U.S.C. § 1514. CBP also can voluntarily reliquidate within 90 days of the liquidation. *See id*. § 1501. But, not all liquidations are protestable; where CBP acts in a ministerial capacity (*i.e.*, without discretion) in imposing a duty, the entry's liquidation cannot be protested. *See id*.; *see also Rimco Inc. v. United States*, 98 F.4th 1046, 1053 (Fed. Cir. 2024) (explaining that "{a} protestable decision under §1514(a) requires Customs to have 'engage{d} in some sort of decision-making process'").

44. While not in the context of a challenge to the legality of tariffs imposed under IEEPA, this Court and the Federal Circuit have cautioned in other contexts that an importer might lack the legal right to recover refunds of duties for entries that have liquidated, even when the underlying legality of a tariff is later found to be unlawful. *See In re Section 301 Cases*, 524 F. Supp. 3d at 1365-66, *citing Shinyei Corp. of America v. United States*, 355 F.3d 1297 (Fed.

Cir. 2004) (examining whether the Federal Circuit's decision in *Shinyei* that the Court of International Trade has the authority to order the government to reliquidate entries is limited to instances "where a preliminary injunction had been sought and denied"); *Target Corp. v. United States,* 134 F.4th 1307, 1316 (Fed. Cir. 2025) (examining a claim from the government that the Court of International Trade lacked the authority in that case to order reliquidation or amend the injunction at issue).

## II.     IEEPA Does Not Authorize Tariffs

45.     The Executive Orders imposing IEEPA duties cite to IEEPA, 50 U.S.C. § 1701 *et seq*., the National Emergencies Act, 50 U.S.C. § 1601 *et seq*., section 604 of the Trade Act of 1974, as amended, 19 U.S.C. § 2483, and 3 U.S.C. § 301 as authority to impose tariffs.  None of these statutes authorizes the President to impose tariffs.

46.     IEEPA became law in 1977.  Both the House and Senate committee reports expressed the view that past Presidents had abused the authority to regulate economic transactions in a national emergency under a different statute—the Trading With the Enemy Act ("TWEA")—by using it in circumstances far removed from those that originally gave rise to the declaration of national emergency.  *See* CHRISTOPER CASEY ET AL., CONG. RSCH. SERV., R45618, THE INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT:  ORIGINS, EVOLUTION, AND USE, at 7, n.51 (2024); H.R. Rep. No. 95-459, at 7–9 (1977); S. Rep. No. 95-466, at 2 (1977).

47.     Accordingly, IEEPA provides the President with authority to take specified actions "to deal with any unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat."  50 U.S.C. § 1701(a).

48.     IEEPA grants the President certain powers, but they "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has

12

been declared for purposes of this chapter and may not be exercised for any other purpose." *Id*. § 1701(b).

49.    Those powers include the ability to "investigation, regulate, or prohibit" certain transactions in foreign exchange, payments through banks involving foreign countries or nationals, or imports of "currency or securities." *Id*. § 1702(a)(1)(A).

50.    Under IEEPA, the President also may control, block or prohibit the movement or importation of funds or property in which "any foreign country" or foreign national has "interest" in, and which is also subject to the U.S. jurisdiction. *Id*. § 1702(a)(1)(B).

51.    Finally, and only when the United States is engaged in "armed hostilities" or has been attacked by a foreign country, the President may "confiscate" property of such a foreign person or country that also is subject to U.S. jurisdiction. *Id*. § 1702(a)(1)(C).

52.    The text of IEEPA does not use the word "tariff" or any term of equivalent meaning. Since enactment in 1977, IEEPA has been amended several times, but the statute has never been amended to authorize, and has never been used by any other President to impose, tariffs.

### A. The United States Constitution Vests in Congress—not the President—the Power to Impose Tariffs

53.    The United States Constitution provides that "{a}ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1. The Constitution also provides that "Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises…" U.S. Const. art. I, § 8, cl. 1 ("Taxing Clause"), and "{t}o regulate Commerce with foreign Nations." *Id*., cl. 3 ("Commerce Clause").

54.    It always has been understood that tariffs fall within the Taxing and Commerce Clauses.

55.     To the extent it is ever permissible under the Constitution for Congress to delegate any part of the powers vested in it by the Constitution to the President, Congress must do so, at a minimum, by providing an intelligible principle to direct and cabin the President's authority.  *See FCC v. Consumers' Rsch.*, 145 S. Ct. 2482, 2498 (2025).  In IEEPA, Congress did no such thing.

56.     Reading IEEPA as authorizing tariffs would be self-defeating because it would then also require striking down IEEPA as unconstitutional under the nondelegation doctrine for lack of any intelligible principle.

57.     Moreover, "courts expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance."  *West Virginia v. EPA*, 597 U.S. 697, 716 (2022) (cleaned up) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U. S. 302, 324 (2014)).  When Congress has not clearly spoken, courts are directed to find that matters of vast "economic and political significance" are beyond the power of the President.  *Biden v. Nebraska*, 600 U.S. 477, 505–06 (2023).

58.     By any objective measure, the Contested IEEPA Tariffs are "of vast economic and political significance."  Because IEEPA does not clearly authorize the President to set tariffs—indeed, the statute does not mention the words "tariff" or "duty," and is not even housed in the same title of the U.S. Code as Congress's actual trade laws (Title 19)—the Contested IEEPA Tariffs cannot stand and Defendants are not authorized to implement and collect them.

### B.  Courts, Including this Court, Have Ruled the IEEPA Duties Are Unlawful

59.     On May 28, 2025, a three-judge panel of this Court granted summary judgment to the plaintiffs in *V.O.S. Selections* and permanently enjoined the government from enforcing the IEEPA duties at issue in that case.  *See V.O.S. Selections*, 772 F. Supp. 3d at 1383.  That decision

was appealed to the Federal Circuit.

60.    The Federal Circuit stayed this Court's decision and injunction and ordered an expedited briefing schedule and hearing.

61.    Sitting *en banc*, the Federal Circuit issued its decision on August 29, 2025, affirming this Court's decision that the IEEPA duties are unlawful. *See V.O.S. Selections*, 149 F.4th at 1340.

62.    In a separate lawsuit filed by a separate group of importers, the U.S. District Court for the District of Columbia held that IEEPA does not authorize tariffs of any sort. *See Learning Res., Inc. v. Trump,* 784 F. Supp. 3d 209 (D.D.C. 2025), *cert. granted before judgment*, No. 24-1287, 2025 LX 308086 (U.S. Sept. 9, 2025). That decision was appealed to the Court of Appeals for the D.C. Circuit. But, before the D.C. Circuit held argument, the United States Supreme Court granted certiorari in both *V.O.S. Selections* and *Learning Resources*. The cases were consolidated, with argument held on November 5, 2025.

### C.  Plaintiffs Paid Preliminary IEEPA Duties

63.    As of the date of this complaint, Plaintiffs have paid IEEPA duties imposed by the Contested IEEPA Tariffs.

64.    Plaintiffs' imports subject to IEEPA entered the United States under new Chapter 99 HTSUS codes from foreign countries.

65.    Plaintiffs have paid IEEPA duties on a continuous basis.

66.    The entries for which Plaintiffs have paid IEEPA duties imposed by the Contested IEEPA Tariffs are scheduled to begin to liquidate on roughly December 15, 2025, under the normal 314-day liquidation cycle, or even sooner if CBP were to accelerate liquidations.

67.    Based on Plaintiffs' knowledge and belief, CBP has advised importers that it will not be extending liquidation for entries subject to IEEPA tariffs.

15

## STATEMENT OF CLAIMS

## COUNT I

## THE CONTESTED IEEPA TARIFFS ARE *ULTRA VIRES* UNDER V.O.S. SELECTIONS

68.    Paragraphs 1-69 are incorporated by reference.

69.    The Court of International Trade in *V.O.S. Selections*, 772 F. Supp. 3d. at 1383 held that the President exceeded his authority under IEEPA, 50 U.S.C. § 1701 *et seq.*, when he imposed tariffs on imported goods.

70.    As the *V.O.S. Selections* court explained, IEEPA authorizes the President only to "investigate, regulate, or prohibit" certain foreign transactions in times of national emergency. *See V.O.S. Selections*, 772 F. Supp. 3d. at 1374.  It does not authorize the imposition of tariffs or duties on imports, and neither the text of IEEPA nor its legislative history contains any clear delegation to the President to set tariff rates.

71.    The Federal Circuit affirmed that interpretation, holding that Congress did not clearly delegate to the President the authority to impose tariffs under IEEPA and that reading IEEPA to permit such authority would raise grave constitutional concerns, including under the major questions and non-delegation doctrines.  *See V.O.S. Selections*, 149 F.4th at 1376–1377.

72.    The Contested IEEPA Tariffs are materially identical in structure, authority claimed, and effect to those struck down in *V.O.S. Selections*.  They purport to impose duties and modify the HTSUS solely under IEEPA.  For the same reasons set forth in *V.O.S. Selections* and as affirmed by the Federal Circuit, those Tariff Orders exceed the President's statutory authority and are therefore unlawful, void *ab initio*, and without effect as applied to Plaintiffs.

73.    Plaintiffs respectfully request that this Court apply its precedent and the binding decision of the Federal Circuit, declare the Contested IEEPA Tariffs unlawful as to Plaintiffs,

16

enjoin Defendants from enforcing them as to Plaintiffs, and order refund of all IEEPA duties

collected from Plaintiffs, with interest as provided by law.

**COUNT II**

**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706
(IN EXCESS OF STATUTORY AUTHORITY)**

74.    Paragraphs 1 through 75 are incorporated by reference.

75.    CBP is an agency within the meaning of the APA.  *See* 5 U.S.C. § 701.  The APA

provides that that "{a} person suffering legal wrong because of agency action, or adversely

affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to

judicial review thereof." *Id*.  The APA authorizes judicial review of "final" agency actions.  *Id.*

§ 704.  Courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right,

power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations,

or short of statutory right." *Id*. § 706(2).

76.    Defendants' agency actions implementing the Contested IEEPA Tariffs by

modifying the HTSUS or otherwise implementing the Contested IEEPA Tariffs and collecting

duties, as set forth in paragraphs 32 to 35, are "final" agency actions because they finally

"determine" the "rights or obligations" of parties and are backed by "legal consequences."

*Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

77.    These actions implementing the Contested IEEPA Tariffs are "in excess of

statutory jurisdiction, authority, {and} limitations" because Defendants lack statutory authority

to implement, collect, or otherwise demand the payment of tariffs that have not been enacted into

law by Congress, have not been duly promulgated pursuant to a lawful delegation from

Congress, or have not been authorized by a lawful executive order or proclamation pursuant to a

17

lawful delegation of Congress.

78.    The agency actions modifying the HTSUS explicitly state that they are implementing the Contested IEEPA Tariffs and cite no other authority—because there is no other authority—for these modifications.

79.    Accordingly, these actions fall within Defendants' statutory jurisdiction and authority only to the extent that the Contested IEEPA Tariffs are themselves lawful. But, as discussed above and alleged in Count I, the Contested IEEPA Tariffs are *ultra vires* and unlawful because they exceed the President's authority under IEEPA. And, as alleged in Count III, to the extent IEEPA does authorize these tariffs, IEEPA is an unlawful delegation of legislative authority. The agency actions modifying the HTSUS or otherwise implementing the Contested IEEPA Tariffs are, thus, themselves unlawful.

80.    Defendants' agency actions are also "contrary to constitutional right, power, privilege or immunity," 5 U.S.C. § 706(2)(B), because, as set forth in Count IV and incorporated by reference herein, their only purported source of authorization—IEEPA—violates Article I, § 1 of the U.S. Constitution.

81.    For these reasons, this Court should declare that Defendants' agency actions are "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), and "contrary to constitutional right, power, privilege, or immunity," *id*. § 706(2)(B), set modifications to the HTSUS aside, and enjoin Defendants and their agents, employees, and all persons acting under their direction or control from taking any action to collect any tariffs announced in the Contested IEEPA Tariffs.

82.    If Defendants' agency actions are not declared unlawful, set aside and enjoined, Plaintiffs will suffer substantial injury, including irreparable injury.

18

## COUNT III

### ALTERNATIVE– THE CONTESTED IEEPA TARIFFS ARE UNCONSTITUTIONAL

83.     Paragraphs 1-84 are incorporated by reference.

84.     In the alternative, if the Court were to construe IEEPA as authorizing tariffs, the Contested IEEPA Tariffs nevertheless must be held unlawful because IEEPA in that event would constitute an impermissible delegation of legislative power from Congress to the President.

85.     Article I, §§ 1 and 8 of the U.S. Constitution vests in Congress exclusively the power to "lay and collect … Duties."  U.S. Const. art. I, § 8, cl. 1.  Under separation of powers principles and binding precedent of the U.S. Supreme Court, Congress cannot delegate its power to the President unless, at the very least, Congress provides an intelligible principle that directs and meaningfully constrains the President's exercise of that power.  IEEPA does not do that.

86.     Plaintiffs therefore seek a declaration that the Contested IEEPA Tariffs are unconstitutional as to Plaintiffs, enjoin Defendants from enforcing them as to Plaintiffs, and order refund of all IEEPA duties collected from Plaintiffs, with interest as provided by law.

## COUNT IV

### (DECLARATORY RELIEF, 28 U.S.C. § 2201)

87.     Paragraphs 1-89 are incorporated by reference.

88.     Federal courts have the power to declare "the rights and other legal relations of any interested party seeking such a declaration."  28 U.S.C. § 2201(a).

89.     Plaintiffs' claims present an actual controversy as to the President's authority under IEEPA, the constitutionality of IEEPA, and the authority of CBP to implement and collect the resulting tariffs.

90.     Plaintiffs are the importers of record and have suffered injury by being required to

pay IEEPA duties as a result of the Contested IEEPA Tariffs on goods they have imported into the United States.

91.    This Court can exercise its equitable power to enter a declaratory judgment that the Contested IEEPA Tariffs are unlawful for any of the above reasons, and that CBP lacks authority to implement and collect the resulting tariffs, as to Plaintiffs.

### PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

1)  declare that the President lacks authority under IEEPA to impose tariffs;

2)  declare that the Contested IEEPA Tariffs are *ultra vires* and void *ab initio* with respect to Plaintiffs;

3)  declare that, with respect to Plaintiffs, CBP lacks authority to implement and collect any tariffs set out in the HTSUS that are based on the Contested IEEPA Tariffs;

4)  with respect to Plaintiffs, enjoin Defendants from imposing and enforcing any tariffs set out in the HTSUS that are based on the Contested IEEPA Tariffs;

5)  order the United States to refund to Plaintiffs all IEEPA duties collected on its entries, including those that it continues to collect during the pendency of this appeal, with interest as provided by law; and

6)  award Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action; and

7)  grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

/s/ Jonathan M. Freed
Jonathan M. Freed
Jarrod M. Goldfeder
Kenneth N. Hammer
Aqmar Rahman
MacKensie R. Sugama
Didie Muller
Sezi Erdin

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, DC  20003
Tel:  (202) 223-3760
jfreed@tradepacificlaw.com

Counsel for Plaintiffs *SANY America Inc.* and *SANY Logistics Equipment America Inc.*

Dated: December 11, 2025